| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN NEAL GREENOE | **DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |

NOW COMES DEFENDANT Steven Neal Greenoe, through undersigned counsel, and respectfully submits this Sentencing Memorandum for consideration by the Court in sentencing. Defendant Greenoe respectfully requests that the Court grant a downward variance from the advisory guideline range in this case.

## FACTS

Greenoe has pled guilty to one count of engaging in international travel to deal in firearms without a license in violation of 18 U.S.C. § 924(n) (Count 11) and one count of exporting firearms from the United States without a license in violation of 22 U.S.C. § 2778(b)(2) and 2278(c) (Count 28). There are substantial disputes regarding the objections to the advisory guideline calculations in the PreSentence Report. Because it appears that the Government contests much about Greenoe's version of events, Greenoe has executed a Declaration affirming that the facts set out in the Sentencing Memorandum are true and accurate, that Declaration being filed contemporaneously herewith.

The case arises out of Greenoe's arrest at RDU airport when he was leaving for his home in the United Kingdom on July 25, 2010, with 16 dissassembled firearms in his luggage. The facts and circumstances surrounding Greenoe and this offense are extremely unusual, and atypical for the types of "gun cases" that regularly appear in this Court.

## I.   Greenoe's Life

Steven Greenoe was born on November 23, 1973 in New Orleans, Louisiana. He was adopted during his first week of life by James and Mary Greenoe, who are the only parents he has ever known. Greenoe has had no contact with his birth parents. Greenoe's father died in 1978, and thereafter his mother Mary moved with him to North Carolina to be closer to family.

Steven attended the public schools in Raleigh and graduated from Sanderson High School in spring 1991. Greenoe immediately enlisted in the United States Marine Corps upon graduating high school, as all of the male members of his family had served in the military. Greenoe completed basic training at Parris Island, South Carolina and was assigned as an intelligence clerk to Marine Aircraft Group 39 at Camp Pendleton, California in early 1992. He served there until suffering a leg injury later in 1992 that left him physically unable to serve further. Greenoe was separated due to his medical condition in 1994, and ultimately honorably discharged later in 1994. *See* Exhibit A (copy of discharge certificate as well as note of commendation from commanding officer).

Greenoe returned to Raleigh and enrolled at North Carolina State University under the GI bill. He remained enrolled there as a student though 1996, when he was three credits short of a bachelors degree because credit for a class taken at another university was disallowed.

### A.   Work for US government intelligence

2

In 1997, Greenoe applied for numerous government employment positions. While participating in a security conference in Washington, DC in 1997, Greenoe was recruited to work for United States government intelligence. Greenoe was commissioned back into the Marine Corps as a reservist in April 1998 and then trained through US intelligence at Quantico, VA (OCS), Damneck, VA (naval intelligence training), Denver, CO (operations and communications training), and then Monterrey, CA (the Defense Language Institute) to work overseas. Greenoe was then deployed overseas to work for US government intelligence in 1999.

Once overseas, Greenoe was seconded to the DSGE (French government intelligence) and attached to the French Foreign Legion, 2d Parachute Regiment, in Corsica. Greenoe was deployed to Chad where he took part in military missions as part of the Legion. Greenoe was then attached to a "direct action team" for US government intelligence in the Balkans for the period 1999-2002, with the team reporting to NATO in Brussels, Belgium. Documentary evidence of Greenoe's attachment to the French Foreign Legion and his assignment to the Balkans are attached hereto as Exhibit B (photos of Greenoe in French Foreign Legion activities) and C (postcard written by Greenoe to family in 2002 from Macedonia) and D (declaration of Robert Monroe, Esq., who represented Greenoe during the period and received attorney-client correspondence from Greenoe in 1999 wherein Greenoe stated that he was returning to government service and would be unable to inform family of nature of work).

After the events of 9/11 in 2001, Greenoe's team was assigned to tracking persons connected with terrorism throughout the Balkans region. In 2002, Greenoe left employment with the US government after his team was decommissioned, and began contracting with private organizations.

During these years, Greenoe was issued numerous documents necessary for his work. One of those documents is the "altered" form DD-214 mentioned in the PreSentence Report at page 12, footnote 3. This document was seized by British government agents from the safe at Greenoe's home after his arrest in July 2010. A copy is attached hereto as Exhibit E. Greenoe states that this document was created by US government intelligence, for use in placing him with the French Foreign Legion. The document is obviously altered, because the "entry to service" date would be impossible because it would make Greenoe 16 years old at the time he entered service. Greenoe never used this altered document after leaving Government service, having kept the document against regulations as "insurance" in his personal safe in the UK, along with other documents discussed herein, to verify his Government work in case the Government denied him given the covert nature of his work. It should be noted that Greenoe had previously filed, in 1994, with the Wake County Registrar of Deeds a nonaltered copy of his DD-214 showing his military status at the time of his discharge in 1994. *See* Exhibit D (declaration of Robert Monroe, Esq., who obtained copy of filed DD-214 from Wake County Registrar of Deeds).

### B. Work in Private Sector and Continuing Connections With US Government Intelligence

Upon leaving government employment in 2002, Greenoe went to work with a French private security company, Jolie Rouge SARL, and worked with them in Afghanistan for a period on a contract held by that company. Greenoe eventually set up an outreach of this French company in the United States under the name Jolie Rouge Group in 2004, exploring the opportunities to obtain security contracts from the US government. At the same time, Greenoe worked in Europe with private security contractors. Greenoe provided close protection services to American celebrities in Europe, and worked as a security contractor in film production. *See*

4

Exhibit F (copy of letter sent by Greenoe to his family in 2004 announcing formation of JRG and his continued work with celebrity protection; and copy of ID badge for Greenoe's security work on "Oceans 12" movie in 2004). This work continued through 2006, and Greenoe maintained his contacts with the US intelligence community through this period.

In January 2007, upon introduction by a contact in US intelligence, Greenoe moved to Dubai, UAE and began work for the Galadari family, one of the wealthiest families in the Middle East. Greenoe by this time had married his long-time girlfriend, an English native, named Liz Robey. Greenoe and his wife moved to Dubai, where Greenoe worked for the Galadari Investment Office as an executive manager, specializing in international business development. *See* Exhibit G (copies of paperwork relating to employment by Galadari Investment Office). Greenoe also was a member of the American Business Council during this period in Dubai. Greenoe worked for the Galadari family until 2008.

Greenoe, during this period, maintained his connections to US government intelligence and provided information to US intelligence regarding arms trafficking that was rampant in the region. Greenoe also worked with US intelligence on issues relating to the rebuilding of the Balkans and the countering of Russian influence in the area.

After leaving his employment with the Galadari family, Greenoe in 2008 worked in Dubai for Levitas Investments, a London-based firm that later headquartered in the UAE. During this time, Greenoe maintained his contacts with US government intelligence, and assisted in bringing foreign investment opportunities to the US. This work led to an introduction to Enstar Capital of London, who wished to invest in the US during the economic downturn. Greenoe worked with both firms on a joint project known as "Levstar" that was involved in providing logistic support to the US war effort in Afghanistan in 2009 and other projects.

5

Greenoe relocated with his wife to her home in England in December 2008, and continued to work with both firms in assisting them with investment opportunities in the United States in both government contracting and the entertainment industry. *See* Exhibit H (samples of emails between Greenoe and personnel with Levitas, Enstar, and McClarty & Associates relating to work projects).[1]

### C. Greenoe's Work with Private Shipping Security and Anti-Piracy, Leading to the Facts Underlying This Case

After relocating with his wife to England at the end of 2008, in addition to his other activities, Greenoe also began working with his American LLC Jolie Rouge Group (hereinafter "JRG") with regard to new anti-piracy issues. Greenoe regularly traveled to the US in relation to this work and to see his family.

In summer 2009, Greenoe began discussions with US government intelligence personnel about a project called "Liberty Hobbs," to provide deniable, non-US citizen armed security guards for non-US flagged vessels leaving European ports that would be passing through areas such as the Suez Canal or Horn of Africa that had high rates of piracy. Greenoe, through JRG, began doing this work from England and the Netherlands. This was "deniable" work, meaning that the Greenoe was told that the US government would not admit his work if uncovered, and that all evidence of the work was to be discarded, including the firearms used in the work at the end of the ship's voyage. Greenoe was required to sign Non-Disclosure Agreements with the government that prevented him from disclosing the existence of the work he was performing.

---

[1] During this entire period from 2005 through 2008, Greenoe also sporadically assisted Jolie Rouge SARL in the placement of former French Foreign Legion personnel and other former military veterans with private military companies, specifically Blackwater of Moyock, NC.

Greenoe then began purchasing firearms in the US and transporting them back to the UK to distribute to the teams that went aboard the vessels. Greenoe did this in violation of the US laws regarding the export of firearms, but did so to provide weaponry to the teams performing the work for which JRG was engaged by US government intelligence. JRG provided these security services for a number of vessels that left UK and Netherlands ports during spring and summer 2010. Payment for JRG's services was done through an account in Oman, and funds were distributed from Oman to the team members to foreign accounts of their choice for payment for their services. Funds in payment for Greenoe's work were made from Oman to his account in Dubai.

After his arrest in July 2010 by the ATF, Greenoe told the investigating agents the identities of the team leaders to whom he distributed firearms. Greenoe told the agents the identity of the financial officer for JRG who handled the account in Oman and paid the team members. Greenoe told the agents about the identities of the US government intelligence personnel with whom he was dealing in performing this anti-piracy work. It is unknown at this point what the investigating agents did with this information.

D.   **Attempts to Verify These Facts**

Given the highly unusual nature of these facts and issues, undersigned counsel Zeszotarski, since coming into this case after Greenoe's guilty plea, has attempted to locate documents verifying Greenoe's account of these facts. Efforts to obtain documents from the US government have not been fruitful. The court recently issued an order to the Defense Intelligence Agency requiring the production of all documents relating to any work performed by Greenoe for that agency. Attached hereto as Exhibit I is the response received by Mr.

Zeszotarski via email on December 9, 2012, wherein the DIA denies having any documents relating to Greenoe.[2]

Likewise, in January 2011 Greenoe's counsel requested copies from the Central Intelligence Agency of any non-disclosure agreements signed by Greenoe from the Government. Attached hereto as Exhibit J is a February 14, 2011 letter from the CIA responding to this request and stating that with respect to documents "that would reveal a <u>classified</u> connection to the CIA, ... the CIA <u>can neither confirm nor deny</u> the existence or nonexistence of records responsive to your request." In short, the US government apparently denies, or is unwilling to provide any record of, any work performed by Greenoe for it.[3]

The Government has produced documents seized from Greenoe's UK home in discovery, however, that do verify portions of Greenoe's account of the facts. When the British agents searched Greenoe's UK home after his arrest in July, 2010, four documents were found in his safe in his home that support his assertion that he was working in the relevant time period for US government intelligence. These documents include:

- attached hereto as Exhibit K is a Wachovia bank wire transfer record dated September 4, 2008, showing the amount of $350,000.00 being wired to the account of "Steven Greenoe Consulting" at the National Bank of Dubai, the sender being "South

---

[2] It appears from the DIA response that the DIA may have treated Greenoe's original request, and the court order, as a request for production of public documents under the Privacy Act. It is unknown if the DIA treated this as a request or order for documents that would be considered classified by the DIA.

[3] The lack of production of any documents verifying Greenoe's work by either the DIA or CIA is contradicted by the declaration of Robert Monroe, Esq., (Exhibit D), who has produced the Court a copy of 1999 correspondence between he and Greenoe wherein Greenoe tells his attorney that he is "returning to government service" and would be unable to inform his family of the nature of his work.

8

Florida Investment Club Orlando." Greenoe states that these funds were US government intelligence funds that were wired to his Dubai account for use with respect to the work he was organizing in the Middle East in 2008 with US government intelligence assets.

- attached hereto as Exhibit L is a Chevy Chase Bank wire transfer form dated August 29, 2008 showing the amount of $175,000.00 being wired to the account of "Steven Greenoe Consulting" at the National Bank of Dubai, from Integrated Capital, LLC, and noting that the wire is "for Everest Capital management." Greenoe states that these funds were also US government intelligence funds that were wired to his Dubai account for use with respect to the work he was organizing in the Middle East in 2008 with US government intelligence assets.

- attached hereto as Exhibit M is 2 page ledger created by Greenoe in 2007 or 2008 that showed how other government funds that had been sent to Greenoe were spent in Macedonia on work done on behalf of US government intelligence. The "SB" referred to on the 4th line is Sev Boja, a person who worked with Greenoe on behalf of US government intelligence at the time in Macedonia.

- Exhibit E, the "altered" Form DD-214 discussed above, was likewise located in Greenoe's safe in his home in the UK by the agents after Greenoe's arrest. As noted above, Greenoe states that this document was created by US government intelligence to assist in placing him with the French Foreign Legion.

In addition to these documents, Greenoe's counsel has been able to uncover substantial documents showing the Greenoe was in fact organizing and operating a business to conduct anti-piracy security in 2009 and 2010:

9

- Attached hereto as Exhibit N is the declaration of Michael Johnson, a man who worked with Greenoe in organizing JRG in 2009 and assisting in securing both logistical support and personnel for the work. Mr. Johnson is a resident of Dubai, United Arab Emerites. Attached hereto as Exhibit M are also emails between Greenoe and Michael Johnson from Greenoe's Google email account. Included among these emails is an email dated January 18, 2010 (at page 2 of the emails), wherein Greenoe writes to Johnson:

  > I travel to the states for meeting with govt officials at the end of this week and so far it is looking good overall. Talent pool is considerable, technical knowledge is of the highest grade and I think we will be able to get a contract.
  >
  > Want to ask you where you saw yourself in the scope of operations? Do you want to stay as a technical advisor, or go aboard as the team member in charge of liaising with the capt & crew? Let's discuss, send me your thoughts.

- Attached hereto as Exhibit O is a July 11, 2010 email from Greenoe to a high school friend describing his career path, and outlining some of the facts set out herein. The email was sent by Greenoe just weeks before his arrest in this case.

- Attached hereto as Exhibit P is a declaration from Greenoe's grandmother, who lives in Raleigh at the address where Greenoe stayed when he traveled to the United States; verifying that Greenoe left early on Friday mornings from the home when he was in Raleigh in early 2010 to attend meetings in the Washington, DC area; and further affirming that Greenoe told his grandmother (prior to his arrest) that he was working as a private contractor for the US government.

- Attached hereto as Exhibit Q are pages from Greenoe's 2010 calendar showing the following: (a) a January 25, 2010 call with Imran Sheik of Enstar Capital of London, England and meeting with Rich Klein of McCarty & Associates in Washington, DC

about Jolie Rouge Group; (b) a notation on February 1, 2010 about a conversation with Ruari McGettigan, one of the team members who performed shipping security work for Jolie Rouge; (c) activity on February 2, 2010 ordering equipment for the teams working as security on ships; (d) activity on February 21, 2010 ordering equipment for the teams working as security on ships; (e) activity on March 12, 2010 noting "reach out to pot. employees, reach out Boston + insurers, reach out to Pelican if no call back"; (f) activity on March 20, 2010 ordering equipment for the teams working as security on ships; (g) notation on April 1, 2010 that Greenoe was picking up Ruari McGettigan for security work; (h) an entry at bottom of page on June 10, 2010 noting "costs" and "profits" and giving codes for 4 separate ships relating to security work jobs; (i) a July 1, 2010 entry noting "JRS Staffing for M1IV and replies" referring to staffing for upcoming security job on ship; (i) entry on July 16, 2010 noting "Darren in to work" referring to person arriving in UK to work security on ship.

At the time of the filing of this Memorandum, Greenoe's counsel is also attempting to open the hard drive from Greenoe's UK computer to locate other documents supporting his position, using computer support personnel. A supplement will be filed if further documents can be located.

E.   **Greenoe's Conditions Since Incarcerated**

Greenoe has been held in custody without bond since his arrest at RDU airport on July 25, 2010. At the time of his arrest, case agents told Greenoe that firearms he had taken to the UK had wound up in the hands of criminals in the UK. Greenoe told the agents about the firearms he had taken overseas, and the purpose of them being taken there, and told the agents that someone among the teams must have distributed the guns without his authorization or knowledge. Greenoe offered to assist the agents in trying to determine who had done so. This

11

discussion with the case agents continued at the time of Greenoe's initial appearance in Raleigh in the Marshal's Office lockup, wherein the agents discussed with Greenoe obtaining his cooperation with the Government with regard to who was receiving the firearms in the UK. Other inmates overheard this conversation, leading to Greenoe being severely assaulted that night as a "snitch" in the Wake County Jail by several inmates.

Greenoe was ultimately transferred to the Pitt County Jail, where he has been held in solitary confinement / segregation since January 2010. Greenoe has not been outside of this jail since his transfer to the jail -- he is given no outdoor recreation time. He spends 23 hours a day in a 6 foot by 8 foot cell with no windows. The lights are on continuously, and Greenoe has no means to exercise. The conditions of solitary confinement are severe and difficult.

Even more tragically, Greenoe became a father for the first time after his incarceration in this case. Greenoe's wife had twin sons on October 22, 2010. His two sons are Greenoe's first and only children. Greenoe has never seen or held his only children, who are now more than one year old.

## ARGUMENT

Greenoe submits that the above facts support a downward variance sentence in this case. Greenoe understands that the Government may attack his version of the facts, and contend that he was exporting firearms for profit. Greenoe denies these motives, and states that he was exporting firearms as part of covert work for the US intelligence community.

Greenoe recognizes the risk inherent in maintaining this unique position before the Court. Nonetheless, fully aware of that risk, Greenoe submits that the matters set out herein are true and correct. *See* Declaration of Steven Greenoe, filed contemporaneously herewith. If Greenoe is not telling the truth, then why are documents showing wire transfers in excess of $500,000 to his

12

Dubai account found in his safe in the UK? Why would Greenoe keep an altered military record form in his safe in the UK and never use it, and maintain an earlier version of the form on file publicly with the Wake County Registrar of Deeds? If Greenoe did not work for US intelligence previously, then why did he sent the letter in 1999 to his attorney telling his attorney he was returning to government service but would be unable to tell his family the nature of his work? And why would Greenoe have emails confirming his efforts in putting together security teams for anti-piracy work in the shipping industry in 2009 and 2010 that long pre-date his arrest, if he was not involved in such activity?

Greenoe is 38 years old and has no prior criminal record. Greenoe served honorably in the United States military. Greenoe has never previously been in any trouble with the law. He is the father of twin boys born after his incarceration in this case. He has been incarcerated for 18 months, and subjected to the most severe form of incarceration in the form of segregation for more than 12 months.

After his arrest, Greenoe told the case agents about all aspects of his taking firearms to the UK, and his purpose in doing so. Greenoe expressed surprise and dismay that someone to whom he had provided firearms would sell or dispose of them outside of their purpose, and offered to assist the Government in investigating who was doing so. Greenoe submits that a consideration of the factors under Section 3553(a) warrants the imposition of a downward variance sentence.

## CONCLUSION

For the reasons set out herein, Defendant Steven Greenoe respectfully requests that the Court grant a downward variance at sentencing and sentence him below the advisory guideline range, after consideration of the factors set out in 18 U.S.C. § 3553(a).

This the 3d day of January, 2012.

/s/ Joseph E. Zeszotarski, Jr.
Joseph E. Zeszotarski, Jr.
State Bar No. 21310
Poyner Spruill LLP
P.O. Box 1801
Raleigh, NC 27602
(919) 783-1005
Fax: (919) 783-1075
jzeszotarski@poyners.com

COUNSEL FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing MEMORANDUM through the electronic service function of the Court's electronic filing system, as follows:

Jane Jackson
Assistant United States Attorney
310 New Bern Avenue
Raleigh, NC 27601

This the 3d day of January, 2012.

/s/ Joseph E. Zeszotarski, Jr.
Counsel for Defendant

14

RALEIGH 621058v1 Case 5:10-cr-00277-FL Document 95 Filed 01/04/12 Page 14 of 15

INDEX OF EXHIBITS

| | |
|---|---|
| A | honorable discharge certificate and note of commendation |
| B | photos of Greenoe in French Foreign Legion activities |
| C | 2002 postcard sent by Greenoe to family from Macedonia |
| D | declaration of Robert Monroe, Esq. with attached documents |
| E | "altered" form DD-214 |
| F | 2004 letter sent by Greenoe to family outlining security work and copy of Greenoe's security badge for work on "Oceans 12" film |
| G | documents relating to Greenoe's work for Galadari family in Dubai |
| H | samples of emails relating to Greenoe's work with Enstar Capital and Levitas Investments |
| I | response of DIA to court order |
| J | response of CIA to records request from Greenoe |
| K | 9/08 wire transfer record of $350,000 to Greenoe's Dubai account |
| L | 8/08 wire transfer record of $175,000 to Greenoe's Dubai account |
| M | Greenoe ledger of government intelligence funds spent in Macedonia in 2007-08 |
| N | declaration of Michael Johnson with emails |
| O | 7/10 email from Greenoe to high school friend |
| P | declaration of Leontine Clayton Tomasetti, Greenoe's grandmother |
| Q | pages from Greenoe's 2010 personal calendar |