IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CR-277-FL
NO. 5:13-CV-29-FL

STEVEN NEAL GREENOE,            )
                               )
            Petitioner,        )
                               )
        v.                     )              ORDER
                               )
UNITED STATES OF AMERICA,       )
                               )
            Respondent.        )


This matter comes before the court on petitioner's motion to vacate, set aside, or correct his

sentence under 28 U.S.C. § 2255 (DE 105). The court held an evidentiary hearing on petitioner's

claim of ineffective assistance of counsel, and the issues raised by that claim have been briefed fully.

In this posture, the court sets forth below findings of fact and conclusions of law necessary for

resolution of the motion.

## BACKGROUND

On March 2, 2011, petitioner pleaded guilty, pursuant to a written plea agreement, to

engaging in international travel to deal in firearms without a license, under 18 U.S.C. § 924(n); and

exporting firearms from the United States without a license, under 22 U.S.C. §§ 2778(b)(2) and

2278(c), which offenses were charged as counts 11 and 28 of a second superseding indictment filed

February 2, 2011. As part of the plea agreement, the government agreed to dismiss all remaining

counts out of fifty offenses charged in the second superseding indictment.

Petitioner was sentenced on January 10, 2012, before the Honorable Malcolm Howard,

Senior United States District Judge, to a term of imprisonment of 120 months on each count to run

concurrently for a total term of 120 months. Petitioner did not appeal. Petitioner filed the instant motion under § 2255, on January 11, 2013, asserting claims on the basis of ineffective assistance of counsel and prosecutorial misconduct. On March 19, 2013, this case was reassigned to the undersigned to conduct all proceedings. Petitioner, with leave of court, filed a memorandum in support of the § 2255 motion on May 10, 2013, along with a sealed motion for discovery.

On July 26, 2013, the government filed a motion to dismiss the § 2255 motion for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6), and a response to the discovery motion. On July 14, 2014, the court granted in part and denied in part the government's motion to dismiss, dismissing petitioner's prosecutorial misconduct claim and allowing petitioner's ineffective assistance of counsel claim to proceed. The court denied petitioner's motion for discovery except to the extent set forth in the court's order. Specifically, the court directed the parties to confer and engage in discovery concerning communications between and among petitioner and his trial counsel, Mark Everett Edwards ("counsel Edwards") and Joseph Zeszotarski ("counsel Zeszotarski"); as well as communications between the prosecution and petitioner; as pertinent to one prong of petitioner's ineffective assistance of counsel claim. (DE 146 at 14-15). The court deferred scheduling of evidentiary hearing until completion of the discovery ordered.

Following a period of discovery, the court held an evidentiary hearing on June 4 and June 5, 2015, during which the court heard testimony of counsel Zeszotarski, counsel Edwards, Assistant United States Attorney Jane Jackson ("AUSA Jackson"), Stephen Richard Klein ("Klein"), and petitioner. The court allowed the parties to submit post-hearing briefs, which the parties filed on June 29, 2015, and July 13, 2015.

2

**DISCUSSION**

**A.      Standard of Review**

In § 2255 proceedings, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "An evidentiary hearing in open court is required when a movant presents a colorable . . . claim showing disputed facts beyond the record or when a credibility determination is necessary in order to resolve the issue." United States v. Ray, 547 F. App'x 343, 345 (4th Cir. 2013) (citing United States v. Witherspoon, 231 F.3d 923, 926-27 (4th Cir.2000)).

**B.      Overview**

The court begins by reviewing the background law pertaining to an ineffective assistance of counsel claim, and issues presented by petitioner's ineffective assistance of counsel claim, incorporating and updating as pertinent here the prior discussion in the court's July 14, 2014, order. Thereafter, the court sets forth its findings of fact and conclusions of law on the issues presented upon evidentiary hearing.

**1.      Background Law**

A successful claim for ineffective assistance of counsel requires petitioner to show that "(1) his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) 'there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Bell v. Evatt, 72 F.3d 421, 427 (4th Cir. 1995) (quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 690. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> "With the benefit of hindsight, rarely can it be said that trial counsel made every possible objection and raised every conceivable viable legal argument. The law, however, requires not perfect but only professionally reasonable performance of counsel." <u>Poyner v. Murray</u>, 964 F.2d 1404, 1423 (4th Cir. 1992) (citing <u>Strickland</u>, 466 U.S. at 669). "[W]hen counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial." <u>Strickland</u>, 466 U.S. at 681.

In addition, a plea colloquy "affords the [government] substantial protection against later claims that the plea was the result of inadequate advice." <u>Missouri v. Frye</u>, 132 S. Ct. 1399, 1406 (2012). "[I]n the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and patently frivolous or false." <u>United States v. Lemaster</u>, 403 F.3d 216, 221-22 (4th Cir. 2005) (internal quotations omitted). "In the absence of clear and convincing evidence to the contrary, [petitioner] must be bound by what he said at the time of his plea." <u>Little v. Allsbrook</u>, 731 F.2d 238, 240 (4th Cir. 1984).

"[I]n order to satisfy the 'prejudice' requirement [in the guilty plea context], the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

"Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010). "[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." Hill, 474 U.S. at 59. "This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." Id. "Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." Id.

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [a particular] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. Thus, the court may first inquire whether in light of the circumstances known to counsel at the time, counsel provided reasonable representation to petitioner. See id. at 690 (stating that the court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"). The Supreme Court has outlined the type of information and communications that will be pertinent to a determination of the reasonableness of counsel's actions, which provides a reference point for the issues raised at evidentiary hearing in this case:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation

5

decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. <u>And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.</u> In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

<u>Id.</u> at 691 (emphasis added).

### 2.    Issues Presented

Petitioner contends that he received ineffective assistance of counsel in advance of plea negotiations and through entry of his plea March 2, 2011, with respect to counsel Edwards, petitioner's sole counsel of record until May 5, 2011.  On that date, counsel Zeszotarski, entered his appearance and allegedly took the lead role during the remaining sentencing phase of petitioner's case.  On that date, he also filed, on behalf of petitioner, the first of multiple motions to continue the sentencing hearing to allow for further discovery, including of foreign witnesses and government agencies.  The motions to continue were allowed, permitting expansion of the record as pertinent to sentencing.  Petitioner asserts that his claims of ineffective assistance of counsel are exclusive to conduct of counsel Edwards.

In particular, petitioner describes three main areas of representation in which counsel Edwards was allegedly ineffective.  <u>First</u>, petitioner contends that counsel Edwards failed to advise petitioner properly on the availability of a "public authority defense" and to investigate properly the defense, in the following respects:

- •    Counsel failed to advise petitioner of the government's February 16, 2011, sealed motion to demand notice of a public authority defense (DE 48);

6

- Counsel failed to advise petitioner of the court's February 22, 2011, sealed order to disclose public authority defense (DE 52);

- Counsel failed to investigate petitioner's public authority defense despite being informed of its substance;

- Counsel failed to explain Fed. R. Crim. P. 12.3 and the concept of a public authority defense to petitioner;

- Counsel failed to respond to the court's February 22, 2011, order to disclose petitioner's public authority defense, and failed to raise it at any point during petitioner's March 2, 2011, plea hearing; and

- Counsel informed petitioner after he had signed the plea agreement that government attorneys believed petitioner had a "public duty" defense.

(DE 131 at 3; see DE 119 at 3-5).

Second, petitioner contends that counsel Edwards failed to sufficiently investigate sentencing enhancements and negotiate terms of a plea agreement that would be favorable to petitioner, in the following respects:

- Counsel failed to investigate the possible sentencing enhancements prior to recommending that petitioner sign the plea agreement; and

- Counsel failed to negotiate a factual stipulate for the plea agreement.

(Id.).

Third, petitioner contends that counsel Edwards provided ineffective assistance of counsel when Edwards sent petitioner a letter taunting and berating petitioner after petitioner signed the plea agreement. (Id.). Petitioner contends that this alleged error, in addition to the foregoing asserted errors, individually and cumulatively resulted in the deprivation of the constitutional right to assistance of counsel.

## C. Findings of Fact

### *Facts in Chronological Order*

1. On July 26, 2010, the government filed a criminal complaint against petitioner, charging illegal exportation of 16 firearms from the United States to the United Kingdom in violation of 18 U.S.C. § 554 and 22 U.S.C. § 2778. (DE 5).

2. The criminal complaint was based on facts set forth in an affidavit by Tony Bell ("Bell"), a special agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), sworn to before U.S. Magistrate Judge William A. Webb on July 26, 2010. (DE 5 at 2-17).

3. Bell's affidavit details petitioner's purchases of firearms in North Carolina from February 2010 to July 2010, as well as petitioner's shipment of firearms in airplane luggage on flights between the United States and United Kingdom.

4. Bell's affidavit details petitioner's statements to law enforcement officers in asserted justification of his conduct, upon interview upon arrest at airline departure gate on July 25, 2010:

> GREENOE stated to [Bell] that he started purchasing these weapons as a means to provide high quality firearms to his employees while providing overseas maritime protection. GREENOE stated that he couldn't obtain high quality weapons overseas and that he was purchasing these weapons here in NC and transporting them back to the UK so that he could provide them to his employees while working for his company, Jolie Rouge Consultants. GREENOE stated that he knew that he wasn't supposed to be bringing these weapons from the US to the UK in his luggage, but was doing it so that he could outfit his employees while working on maritime security contracts abroad.

(DE 5 at 15, ¶52) (emphasis added).

8

5.  On July 26, 2010, at his initial appearance in court, petitioner was advised of charges, rights, and maximum penalties, and the government moved for detention.  Petitioner was remanded to the custody of the United States Marshal.

6.  The court ordered appointment of the Federal Public Defender to represent petitioner, and attorney Joseph B. Gilbert ("Gilbert") entered a notice of appearance on July 27, 2010.

7.  On July 27, 2010, petitioner filed a request for discovery and disclosure of all exculpatory evidence by the government.  (DE 12).

8.  On July 29, 2010, petitioner appeared for a preliminary hearing and detention hearing, with AUSA Jackson appearing for the government, and attorney Diana Pereira with the Federal Public Defender's Office, appearing for petitioner, whereupon on the government's motion for detention the court found that petitioner was a risk of flight and danger to the community and ordered petitioner committed to the custody of the United States Marshal.  (DE 17).

9.  In early August, 2010, petitioner retained counsel Edwards to represent him in the case on a $15,000 flat fee, with a $10,000 trial fee if petitioner proceeded to trial.  (Tr. at 81).[1]

10.  On August 6, 2010, counsel Edwards visited petitioner in the Piedmont Regional Jail. (J.E. 161).[2]  At that visit, petitioner explained that he conducted his charged conduct in accordance with authorization from the Central Intelligence Agency ("CIA"), suggesting that he was shipping firearms to the United Kingdom pursuant to security contracts to protect ships from piracy.  (Tr. 301).

---

[1] Citations to "Tr." are to the transcript of the evidentiary hearing (filed at DE 174 and 174-1), and use the page number specified at the top right of each page of the transcript, rather than the page number specified as a PDF footer when opening the documents electronically from the link in the court's docket.

[2] Citations to "J.E." refer to the Joint Exhibits provided to the court at the evidentiary hearing.

11. At the August 6, 2010, meeting with counsel Edwards, petitioner explained that the CIA had given him a "safe number" to call, and that "if something ever happened, if he was intercepted or caught like he was in this case, that he could call that number and the agency would come in, straighten everything out and he would go away with no charges." (Tr. 301).

12. Counsel Edwards called the number, but it was disconnected. (Id.). Counsel Edwards looked up the area code on the number and noted it "was somewhere in Texas." (J.E. 166 at 22).

13. When counsel Edwards reported this to petitioner, petitioner was "upset with the public defender that initially represented him" because he gave the number to him also but he did not make the call, and petitioner explained that "after a certain amount of time the number would no[] longer be good if he was arrested and at that point they'd have formal charges." (Id. at 301-02).

14. Counsel Edwards's failure to connect to the "safe number" provided by petitioner gave counsel Edwards reason to question whether petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

15. On August 12, 2010, counsel Edwards entered a notice of appearance. (DE 19).

16. On August 18, 2010, the government filed an indictment as to petitioner, charging him with nine counts of shipment of firearms without notice to the carrier that the firearms were being shipped in violation of 18 U.S.C. §§ 922(e) and 924 (counts 1 to 9); nine counts of export of firearms without a license, in violation of 22 U.S.C. § 2778 (counts 10 to 18); and nine further counts of export of firearms without a license, in violation of 18 U.S.C. § 554 (counts 19 to 27). (DE 20).

17.  On August 20, 2010, counsel Gilbert moved to withdraw as attorney, which motion the court granted.  (DE 22, 23).

18.  On August 24, 2010, the court entered a scheduling order setting arraignment for the October 12, 2010, term of court, requiring pre-trial conference on or before September 8, 2010, motions due September 22, 2010, and responses thereto by October 5, 2010.  (DE 24).

19.  In or around late August 2010, AUSA Jackson and Special Agent Fannelly told counsel Edwards that during petitioner's initial debriefing incident to arrest, petitioner told arresting agents that he was "working for the Government." (Tr. 354).

20.  In or around late August 2010, counsel Edwards reviewed Federal Rule of Criminal Procedure 12.3, which provides, in part:

> If a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing and must file a copy of the notice with the clerk within the time provided for filing a pretrial motion, or at any later time the court sets. . . .
> The notice must contain the following information:
> (A) the law enforcement agency or federal intelligence agency involved;
> (B) the agency member on whose behalf the defendant claims to have acted; and
> (C) the time during which the defendant claims to have acted with public authority . . . .
> An attorney for the government may request in writing that the defendant disclose the name, address, and telephone number of each witness the defendant intends to rely on to establish a public-authority defense.

Fed. R. Crim. P. 12.3(a)(1), (2), & (4)(a).  (Tr. 83, 356).

21.  In or around late August 2010, counsel Edwards believed that petitioner's "only defense would have been [a] public authority defense." (Tr. 357).

22. In or around late August 2010, counsel Edwards was informed by petitioner and his family that petitioner had been in the French Foreign Legion, had worked in the Middle East, and "had started a business." (Tr. 89-90).

23. Petitioner also told counsel Edwards that he had worked previously with Klein "on the movie Kite Runner." (Tr. 89). Klein works for a company, McClarty Associates, providing advisory services in communications, strategic planning, and film studio script development and foreign location consulting. (Tr. 119, 138, 202).

24. Petitioner told counsel Edwards to contact Klein, suggesting that Klein knew that petitioner was involved in a government authorized operation at the time of the charged conduct. (Tr. 144, 264, 265). Petitioner also suggested that Klein could verify that petitioner previously had done work for the CIA. (Id.).

25. In September 2010, to investigate the potential public authority defense, counsel Edwards spoke with Klein by telephone. (Tr. 83; J.E. 166 at 21; J.E. 51). Counsel Edwards asked Klein "if he knew of any work that [petitioner] had done for the CIA, whether he was aware that [petitioner] was running an armed protection service for ships," and Klein responded "no." (Tr. 87). Klein denied knowing anything about petitioner's charged conduct. (Tr. 120). Klein stated he was unaware of the government authorizing covert anti-piracy initiatives, nor anything about petitioner's involvement in a covert government operation. (Tr. 144, 266). Klein suggested that if petitioner was authorized as such, petitioner would have an emergency government contact who could verify this. (Tr. 145).

26. Klein stated that he and petitioner "were pretty good friends, or at least on a friendly basis," and petitioner "had worked on some projects with him in the past." (Tr. 88-89). Klein stated

that petitioner "had worked with [Klein] on security on [Kite Runner] and maybe some others" including "the Ocean 12 or Ocean movies," and "[h]e had worked security for Madonna," all "connected to Mr. Klein's firm." (Tr. 120).

27. Klein's conversation with counsel Edwards gave counsel Edwards reason to question whether petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

28. In or around late August or September 2010, petitioner told counsel Edwards "that a person named Dawan [Stanford] was his business partner and that [counsel Edwards] could contact [Stanford]" about petitioner's work for the government in getting armed security teams to go on ships. (Tr. 121, 269).

29. Petitioner told counsel Edwards that Stanford was responsible for setting up a United States corporate entity, Jolie Rouge; that Stanford had met Klein; and that Stanford had applied for a security clearance in the summer of 2010 so that he could start working on contracts abroad. (Tr. 202).

30. When petitioner told counsel Edwards about Jolie Rouge, counsel Edwards stated that they would need to have some documentation, some proof, of the corporate arrangements and contracts that petitioner was describing. (Tr. 315).

31. Sometime in late August 2010, counsel Edwards spoke to Stanford. (Tr. 270). When counsel Edwards spoke to Stanford, Stanford said that "he didn't know anything about any armed security teams going on ships." (Tr. 121, 270).

32.  Stanford's response to counsel Edwards gave counsel Edwards reason to doubt that petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

33.  In or around late August or September, 2010, counsel Edwards tried to contact two individuals involved with purchasing firearms for petitioner, Doug Champion ("Champion") and Crash Gregg ("Gregg").  (J.E. 166, 278).  These individuals both had retained counsel and would not speak with counsel Edwards. (Id.).

34.  Counsel Edwards did not attempt to contact alleged co-conspirators in the United Kingdom, Neil Copplestone and Steven Cardwell, reasonably believing that they would not speak about the matter because they were facing serious charges in the United Kingdom. (Tr. 86).

35.  On August 31, 2010, counsel Edwards received about 68 pages of discovery from the government.  (See J.E. 42).

36.  Discovery received from the government included a report of an agent interview of Gregg, wherein Gregg stated that petitioner "operated a security company in the Washington DC area so Gregg thought it was 'ok' for [petitioner] to take the guns" that Gregg had bought.  (J.E. 39). Counsel Edwards reviewed this report and reasonably did not believe it was helpful to a public authority defense, where it included inconsistencies and also revealed that petitioner did not have enough money in his account to cover a check to pay for the guns.  (Tr. 280).

37. Further discovery received from the government included a report of an agent interview with Champion, wherein Champion "stated that he believed that [petitioner] owned a security company, that [petitioner] did security on movie locations in Europe, and also security on international shipping. [The agent] asked Champion how Champion knew this.  Champion stated

14

that [petitioner] told him this plus he had seen [petitioner's] company web site." (J.E. 33). Champion's statement regarding petitioner's company provided no concrete leads in support of petitioner's asserted defense, because Champion's statement only repeated, without corroborating information or detail, information already asserted by petitioner.

38. On August 31, 2010, counsel Edwards wrote to petitioner's then-wife that "I am going to do everything possible to get Steve out of this mess with as short a sentence as possible. He will be going to prison here though." (J.E. 41). Counsel Edwards believed at the time of this message that "it was a strong possibility" that petitioner was going to serve a prison sentence, and he wrote that prediction to petitioner's then-wife because he prefers "not to build people's hopes up on what the result of a case will be." (Tr. 81-82).

39. On September 1, 2010, counsel Edwards wrote to petitioner's mother that "I have done my best to calm [petitioner's then-wife] down and honestly tell her what I think will happen here." (Tr. 42).

40. On September 2, 2010, counsel Edwards wrote to petitioner's mother that he had received a call from AUSA Jackson, wherein AUSA Jackson indicated that the government "know[s] that [petitioner] is now claiming to be an 'operative' and they are not buying it." (J.E. 45). Counsel Edwards further stated "if they think he is lying about what he sa[i]d happened to the guns, Ms. Jackson will file even more charges . . . ." (J.E. 45).

41. On September 5, 2010, counsel Edwards visited petitioner at the Piedmont Regional Jail. (J.E. 161).

42. On September 7, 2010, agents interviewed Stanford about his work with Jolie Rouge. Stanford stated that Jolie Rouge had no outstanding contracts, receipts, or records, of any items "that

would be used to conduct maritime security." (J.E. 47). When asked what petitioner was doing to make money, however, Stanford stated that he "thought that [petitioner] was working for the U.S. Government." (Id.).

43. On September 15, 2010, the government filed a superseding indictment as to petitioner, charging him with 16 additional counts of making false statements to a federally licensed dealer, in violation of 18 U.S.C. §§ 922(a)(6) and 924. (DE 25).

44. On September 21, 2010, counsel Edwards received a copy of the report of interview with Stanford, along with other discovery materials. Counsel Edwards believed the report was consistent with what Stanford had told him. (J.E. 34).

45. The Stanford interview report gave counsel Edwards further reason to doubt that petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts. Stanford's passing statement that he "thought that [petitioner] was working for the U.S. Government," without elaboration or corroborating factual information, provided minimal reason to continue inquiry into whether petitioner was acting with government authorization.

46. On September 25, 2010, petitioner wrote a letter to counsel Edwards stating, in part: "Mostly, I'm concerned about cross prosecution. If I plea will the Brits be able to assess [ ] penalty for all the indictments? Or just charges? . . . . this is complicated. Just get me a sweet employment deal so I can give them everything and have no more worries except staying alive while undercover. Please!" (J.E. 53).

47. On September 26, 2010, counsel Edwards filed, on behalf of petitioner,[3] a motion to continue arraignment at least two to three months, stating as grounds that "[t]he case against Mr. Greenoe is fairly complex and involves investigative agencies in Great Britain as well as local federal agencies. On Tuesday, September 21st, the government provided undersigned counsel with two thick notebooks of additional discovery. . . . It appears likely that undersigned counsel will have to travel to Great Britain in the coming weeks to meet with the investigative authorities there." (DE 29).

48. On September 27, 2010, the court continued arraignment to the court's December 14, 2010, term.

49. In or around September and October 2010, counsel Edwards asked petitioner to tell him where he could see a contract with a shipping line, corroborating petitioner's assertion that he was acting under government authority to arm ships for security contracts. (Tr. 115, 118, 121). Petitioner told counsel Edwards "he had friends he would contact, and at one point he told [counsel Edwards] that [petitioner's] name was all over the Middle East and that [counsel Edwards] could expect that [counsel Edwards] would be getting corroboration, including contracts." (Tr. 115-116).

50. On October 12, 2010, counsel Edwards wrote to petitioner's then-wife: "Steve's case is complicated by the interest that the UK has in the case. Please understand that Steve will be receiving some sort of prison sentence here. I am going to do everything I can do to ensure that sentence is as short as possible, but we are still talking about a matter of several years. Steve has cooperated so far, and if the powers that be on your side of the Atlantic and my side believe he is

---

[3] Because the instant motion concerns the performance of counsel, and the actions by counsel, the court identifies filings as made by particular counsel on behalf of petitioner, rather than identifying such filings as made by petitioner.

<u>being truthful</u>, it can greatly affect the length of time he is away from you."  (J.E. 61) (emphasis added).

51.  On October 13, 2010, petitioner's then-wife wrote: "As for the involvement of a government agency – this I cannot begin to comprehend.  Other than the hypothesis presented to me by Tom Magnuson I am at a loss as to what has been going on." (J.E. 62).  Where petitioner's then-wife could not comprehend the involvement of a government agency in petitioner's conduct, counsel Edwards had from this communication further reason to doubt that petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

52.  On October 15, 2010, petitioner met with counsel Edwards.  Petitioner offered the following account of this meeting in a letter sent to his mother on October 16, 2010:

> Yesterdays' meeting with [counsel Edwards] brought home some harsh realities.  I will be a felon, no one I served will stand up for me and my government will not speak to me until I take a plea.  If I went to trial they would try and crucify me because no one goes to trial unless they are Martha Stewart etc.  Therefore the path back to my family is this.  I will answer any Q they pose through Mark, they will arraign me in Dec., they will then offer me a plea which we hope will be 33-41 months but could be 46-57 months, they will then speak with me . . . . only then at debriefing will they recognize me as an asset – if at all – and if they like what I give them then  . . . maybe they will ask the judge . . . [for] a sentence reduction . . . [to] time served.

(J.E. 63).  In a separate letter to his mother, petitioner stated: "When I asked [counsel Edwards] what the US atty would offer if they like the answer to the Q's he said they might offer a lower plea say 33-42 months instead of 46-57 months." (J.E. 64).

53.  Petitioner's account of this October 15, 2010, meeting with counsel Edwards demonstrates that counsel Edwards discussed with petitioner the importance of truthful disclosure and cooperation with the government, and that this was the best strategy for obtaining a low

18

sentence. Petitioner's account of this meeting also demonstrates that counsel explained the possibility, based upon information then known at that time, of a sentence of 57 months, and that this prediction was based on the assumption that petitioner would proceed with a truthful debriefing, plea, and cooperation, as described. Otherwise, counsel Edwards suggested that a longer sentence could be expected.

54. At this meeting on October 15, 2010, or shortly thereafter, petitioner received through counsel Edwards a letter from AUSA Jackson requesting a proffer of answers to questions posed by the government, including information about the location of firearms in the United Kingdom, and details of his arrangements with others in making shipments of firearms to the United Kingdom. (J.E. 59, 64).

55. On October 18, 2010, the government filed a sealed ex parte motion to disclose grand jury materials, sought for use in conjunction with a pending criminal prosecution in the United Kingdom.

56. The government's October 18, 2010, motion states that the information is to be used to contradict statements made by petitioner in justification of his actions upon his arrest, specifically:

> The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and Immigration and Custom Enforcement (ICE) subpoenaed Greenoe's personal and business bank accounts. This information demonstrates that Greenoe's business was a front for his gun trafficking. Ian Davies, Senior Crown Prosecutor, . . . wants to use this information to establish that Greenoe's original statement, given at the time of his arrest in the United States, was false. Greenoe claimed that the guns were for his business, but the records indicated this to be untrue. [UK] Prosecutors . . . will use this information against Greenoe, if he is ever extradited to the United Kingdom. The information will also be used in future investigation against Greenoe's coconspirators in possible court trials. . . . In the United Kingdom, all handguns are illegal, and the mere possession is a serious crime. The firearms were sold to large drug dealers."

(DE 33 at 2-3) (emphasis added).

57.  In its October 18, 2010 motion, the government requested disclosure of all evidence produced or obtained in response to a grand jury subpoena issued on August 4, 2010, to Bank of America, for any and all records pertaining to Steven Neal Greenoe, Jolie Rouge Consultants and/or Jolie Rouge Group, for the time period January 1, 2010 to August 4, 2010, in connection with the above-referenced criminal case, copies of which are set forth in Attachment A to the motion.  (DE 33 at 3).

58.  On October 21, 2010, petitioner provided to counsel Edwards answers to proffer questions as requested by AUSA Jackson, and counsel Edwards typed out these answers and sent them by letter to AUSA Jackson on November 1, 2010.  (J.E. 67).  The answers to the proffer questions did not provide any concrete information regarding contracts for providing security to shipping vessels.  (See, e.g., J.E. 67 at 5-6).  Nor did the answers provide a credible account of how the firearms transported to the United Kingdom ended up with individuals involved in crimes in the United Kingdom.  (See, e.g., J.E. 67 at 3). The answers to the proffer questions gave counsel Edwards further reason to doubt that petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

59.  On November 1, 2010, the court granted the government's motion for disclosure of grand jury materials.

60.  On November 5, 2010, AUSA Jackson informed counsel Edwards that she was going "to go up the chain of command to that 'other agency' (as she put it) to get an answer on the non-disclosure agreements," referencing an inquiry by the prosecution as to whether petitioner was subject to any non-disclosure agreements pertaining to supply of firearms for security services on ships. (J.E. 68; J.E. 165 at 36-37).

61.  On November 10, 2010, petitioner's then-wife emailed counsel Edwards stating as follows:

> I was of the impression that [petitioner] was working for a company in London called Enstar (venture capital/investment company). . . . It has since transpired that he was never employed by this company . . . . His cast iron assurances no longer hold much weight.  Another surprise was his short military career.  My family, friends and I were all lead to believe he achieved the rank of Captain.  Again this was disproved yesterday by the American investigators.

(J.E. 70 at 1).  Counsel Edwards responded that he understood through petitioner that petitioner had covert military experience following his discharge.  (J.E. 70 at 2).  Following a further phone conversation, petitioner's then-wife emailed counsel Edwards a series of photos from petitioner's service in the foreign legion.  (J.E. 70 at 7-15).  The lack of consistency between petitioner's asserted account of events and his then-wife's understanding of events gave counsel Edwards further reason to doubt the veracity of petitioner's account.

62.  On November 16, 2010, the government filed a sealed motion to continue arraignment to the March 2011 criminal term, stating that counsel for defendant consented to the motion.

63.  As the reason for the November 16, 2010, motion to continue, the motion provides:

> <u>The defendant has raised the potential of a public authority defense. That is, that the defendant claims that he was working with another federal agency that led him to believe that he was authorized to engage in otherwise criminal activity.</u> The United States will need to determine whether or not the defendant was in fact working with another government agency. Based on the sensitive nature of this request, the United States anticipates that this will require a significant period of time.

(DE 37 at 2) (emphasis added).

64.  As such, by November 2010, counsel Edwards had raised with the government the possibility that petitioner could seek to assert a public authority defense, and the government was

21

engaged in determining whether defendant was in fact working under the authority of a government agency. (See Tr. 62, 299).

65.  On November 18, 2010, the court granted the motion to continue and arraignment was continued to the March 8, 2011 term.

66.  On November 20, 2010, petitioner wrote a letter to counsel Edwards, including the following:

> As I mentioned several [] ago, we know we aren't going to trial due to my mistakes and hubris.  Instead [] to achieve the lowest plea range possible. . . . Correct me if I'm wrong but we [] by continuing our cooperation (proffer ltr etc), instilling confidence in there being [] than meets the eye (NDA waiver), offering gag orders with the press, offering a [] even before receiving the plea, etc.  Hopefully this will result, by my amateur [] in a 33-41 months rather than 46-57 month.  Of course we must take into [] the Brits and their pressure.

(J.E. 76).[4]  This letter reasonably suggested to counsel Edwards that petitioner and counsel Edwards mutually understood that the best strategy for petitioner was to cooperate fully with the government and in return receive the lowest possible sentence following a guilty plea.

67.  In late 2010, AUSA Jackson told counsel Edwards that the government's investigation concerning the potential government authority defense in fact uncovered no information supporting a public authority defense.  (Tr. 73, 299-300, 302; J.E. 165 at 37).

68.  In late 2010, AUSA Jackson detailed for counsel Edwards the strength of evidence against petitioner on the charges asserted.  (Tr. 73).

69.   In late 2010, AUSA Jackson emphasized repeatedly how valuable petitioner's cooperation could be, given the multitude of crime scenes in the United Kingdom turning up guns

---

[4]  The brackets in this quoted material represent words that are partial or cut-off by the margin in the copy in the record.

that petitioner had shipped, and the importance of this issue to United States and United Kingdom agents. (Tr. 73).

70. Based on information communicated by AUSA Jackson, counsel Edwards had further reason to doubt that petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts. Based on the same information, coupled with petitioner's November 20, 2010, letter, counsel Edwards had strong basis to cease investigation into a government authority defense and to counsel his client to cooperate with the government.

71. On December 30, 2010, petitioner wrote a letter to counsel Edwards, including the following:

> I valued your time last night and recognize it was exorbitant . . . . I want to see a judge. As your client I demand that you facilitate my arraignment ASAP. . . . Throughout this experience I have been threatened by the guidelines. . . . I didn't remove #'s, I'm being threatened with enhancements. . . . How can I cooperate more than waiving my 5th, leading them to arrests and being willing to give up my best friend? . . . . I ask for you to recalculate my guidelines and transmit them to me. If I am correct, they should now be 33-41 months based on their still saying that I "knowingly shipped them to persons for use in crime," I still contend they should be 21-27 because I didn't.

(J.E. 86) (emphasis added). In light of this letter, it is reasonable to infer that counsel Edwards discussed information with petitioner on December 29, 2010, regarding potential guidelines range enhancements that could be used against petitioner if petitioner was not fully forthcoming in cooperation with the government. Petitioner's suggestion at evidentiary hearing to the contrary that counsel Edwards "never" discussed specific guidelines or enhancements, (see Tr. 192), is not credible.

72. On January 4, 2011, counsel Edwards wrote to petitioner's then-wife:

In theory, [petitioner] is facing the possibility of many decades in prison. In reality, I think he [sic] sentence will work out to a range of 24 to 48 months. Our sentencing process is based on a guidelines system that takes into account a number of factors. . . . Admitting wrong doing and truthfully disclosing all information related to the wrong doing is a critical factor at sentencing. . . . I am awaiting additional discovery that may help shed more light on what [the prosecution] think happened.

(J.E. 91).

73. On January 6, 2011, petitioner wrote to counsel Edwards that "the investigators are trying to say my actions were for criminal profit, even though no evidence of such exists, nor will it." (J.E. 94).

74. In late December, 2010, or early January, 2011, AUSA Jackson and counsel Edwards had a conversation about evidence obtained from agents, which evidence AUSA Jackson and Edwards believed to be strong evidence of guilt. (Tr. 63-64; see Tr. 284-87, 311-12; J.E. 165 at 43-44). This evidence included "bank deposits going into [petitioner's] account that corresponded with the shipments of the firearms in close proximity"; an email dated February 25, 2010, memorializing an "undercover deal where the guns that [petitioner] had just brought over were offered for sale to an undercover agent"; an email the same date in which petitioner assured Champion that guns will be forever outside the United States with no serial numbers; and a Skype chat where petitioner and Cardwell "were talking about barrels and hyper expensive . . . [and] all sorts of gun parts, and it was indicative of drug trafficking," not of arming employees to protect against pirates. (Tr. 63-64; see Tr. 284-87, 311-12).

75. With respect to the Skype chat, for example, counsel Edwards "thought it was a real problem for the public authority defense." (Tr. 292, 297).

76. On January 18, 2011, counsel Edwards met with petitioner to discuss the discovery received, and for purposes of having petitioner sign paperwork for finalizing divorce proceedings

24

with his then-wife. (J.E. 103; see J.E. 98; J.E. 160; Tr. 285-287, 347-48). Petitioner also signed a letter drafted by counsel Edwards for purposes of a Freedom of Information Act request made to the Office of Naval Intelligence regarding the existence of any non-disclosure agreements signed in the course of covert operations.

77. On January 19, 2011, petitioner wrote to counsel Edwards: "you asked me if there was a way for my computer to point to the cloud, I replied that I did not know except for maybe browser history, I am looking into this further, will keep you posted. I had my laptop upgraded to Win7 in April. . . ." (J.E. 107). This statement by petitioner did not give counsel Edwards reason at that time to pursue further investigation into location of contracts that would support a public authority defense, but rather suggested to counsel Edwards that petitioner would be providing further information on access points for such contracts.

78. In his January 19, 2011, letter, petitioner also referenced an email between petitioner and Doug Champion, which email counsel Edwards and petitioner had discussed on January 18, 2011, as a further example of evidence contradicting petitioner's asserted defense and counseling in favor of a guilty plea. (Tr. 285, 347-48). In light of petitioner's January 19, 2011, letter, petitioner's suggestion at the evidentiary hearing that counsel did not discuss the email with him was not credible. (See Tr. 226-27).

79. On January 26, 2011, petitioner wrote to counsel Edwards, regarding responses to the government's proffer questions, stating "Please do not bother with any direction that questions validity of responses. I haven't changed my 'story' in six months. I'm not going to start now no matter how much simple minded opposition would like . . . . As promised, contracts and bank records for [Jolie Rouge] are coming from UAE & Mozambique." (J.E. 111). These statements by

petitioner did not give counsel Edwards reason at that time to pursue further investigation into location of contracts that would support a public authority defense, but rather suggested to counsel Edwards that further information was forthcoming.

80. On January 28, 2011, agents interviewed Klein (J.E. 112). "Klein stated that he had no knowledge of [petitioner's] firearms trafficking and had no knowledge of any contracts for his supposed private security consulting company, Jolie Rouge." (Id.).

81. Counsel Edwards saw the report of this interview with Klein, and did not believe any follow-up was called for. (Tr. 268).

82. This Klein interview report gave counsel Edwards further reason to doubt that petitioner was telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

83. At no point in his representation of petitioner did attorney Edwards find or receive from any leads any contracts with shipping companies regarding provision of security on ships. (See, e.g., Tr. 274-77). The absence of any contracts, and the absence of any consistent leads, after petitioner stated that contracts would be provided, gave counsel Edwards further reason to doubt that petitioner was telling the truth about acting in accordance with government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

84. By early February, 2011, counsel Edwards believed there were a number of problems with raising a public authority defense, or otherwise in proving that petitioner was acting within the scope of any purported government authorization in shipping firearms to the United Kingdom. In particular, counsel Edwards recognized the weight of evidence of gun sales in the United Kingdom,

inconsistencies in petitioner's statements, financial motives of petitioner, lack of leads through Stafford and Klein, and lack of documentation of contracts. (Tr. 311-15).

85. Around early February, 2011, counsel Edwards reasonably advised petitioner that the evidence did not support that petitioner was acting within the scope of government authorization, and that he would lose in asserting such a defense at trial, or not benefit in asserting such a defense in discussions with the government. (Tr. 315). Counsel Edwards reasonably advised petitioner that a plea agreement would result in a shorter sentence than following trial. (Tr. 315). After so informing petitioner, petitioner did not provide counsel Edwards any additional information to provide reason for counsel Edwards to continue investigating a public authority defense. (Tr. 315).

86. Around early February, 2011, counsel Edwards reasonably believed that petitioner would provide information to the government that could support a sentencing reduction for cooperation. (Tr. 315).

87. On February 2, 2011, the government filed a second superseding indictment, charging petitioner with fifty counts: one count of conspiracy to export firearms without license, in violation of 18 U.S.C. § 371; one count of dealing in firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924 (count 2); nine counts of dealing in firearms without a license, in violation of 18 U.S.C. § 924(n) (counts 3 to 11); nine counts of shipment of firearms without notice to the carrier that the firearms were being shipped in violation of 18 U.S.C. §§ 922(e) and 924 (counts 12 to 19); ten counts of export of firearms without a license, in violation of 22 U.S.C. § 2778 (counts 20 to 29); and nine further counts of export of firearms without a license, in violation of 18 U.S.C. § 554 (counts 30 to 38); 12 additional counts of making false statements to a federally licensed dealer, in violation of 18 U.S.C. §§ 922(a)(6) and 924 (counts 39 to 50). (DE 41).

88. On February 3, 2011, the government sent to counsel Edwards a proposed memorandum of plea agreement, for signature by AUSA Jackson, counsel Edwards, and petitioner. (J.E. 115). The proposed plea agreement included provisions for truthful disclosures and cooperation by petitioner, and provided for a guilty plea to count 11 (traveling in foreign commerce to deal in firearms without a license) and count 28 (exporting firearms without a license), with specification that both counts carried a maximum term of imprisonment of 10 years, for a total maximum sentence of 20 years imprisonment. (Id.). The proposed plea agreement included provision for 3-level reduction for acceptance of responsibility, not binding on the court. (Id.).

89. On February 8, 2011, petitioner signed the proposed plea agreement. (J.E. 116; see DE 48 at 3; Tr. 97). That same date, petitioner wrote to counsel:

> Enclosed is the signature page to my plea, as per your request. I completely understand your expressed points about being truthful, implied in letter to Graham, as well as the newest threat of "leadership role." Perhaps in vain, I hope you will be able to strategize a mitigation of the ire against me by the governments involved that includes me responding as you know I will to their interrogation. My story is an honorable one, except my foolish seduction by poor role models. I will give them everything on everyone I know, but I fear that they will not pursue anything that doesn't fit their narrative. Thank you for being there for the debrief, although I expect little from you except bearing witness so they do not later say I confessed to something, etc., as with the incredible pressure on them they are likely to do.

(J.E. 117). It is a reasonable inference from this letter that counsel Edwards discussed with petitioner the possibility of an enhancement in sentence due to petitioner's role as a leader or manager in offense conduct, and that the government would seek such enhancement if petitioner was not truthful or forthcoming in debriefing with the government.

90. On February 10, 2011, counsel Edwards sent to AUSA Jackson the plea agreement signed by petitioner, and noted to petitioner's mother and then-wife that "[t]he agents are anxious to debrief him." (J.E. 118).

91.  On February 10, 2011, petitioner wrote to counsel Edwards, stating:

This week Somali pirates killed two prisoners, hijacked a $200 million dollar supertanker of crude oil bound for the US and the authorities say they are operating at least 8 mother ships . . . . Certainly these developments and their heavy press coverage give the US and UK gov'ts an opportunity to recognize/and thereby defuse/Jolie Rouge.  If they just say it was unsanctioned and give no government authority they could still tamper the misplaced ire over the exaggerated number of firearms on the streets of the UK.  Perhaps I'm dreaming and I certainly know I am doomed regardless of how much assistance I provide the investigators, but perhaps bigger picture/cooler heads could grasp this situation and control the public perception.  Can you / will you reach out and suggest it?  . . . . [Y]ou say my sentence will be based on my 'truthfulness' to the investigators, I am not concerned with having lost your confidence.

(J.E. 119).  It is a reasonable inference from this letter and its immediately surrounding circumstances that counsel Edwards emphasized to petitioner the need to be forthcoming in debriefing with the government to receive benefit in sentencing.  It further is a reasonable inference that counsel Edwards suggested to petitioner that petitioner was not telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

92.  On February 14, 2011, the government filed a sealed motion to remove petitioner from the custody of the United States Marshal "so as to allow federal agents to conduct a detailed interview with the defendant for the purpose of intelligence debriefings, trial preparation and evidence review,"  (DE 44), which motion the court granted on February 15, 2011.

93.  On February 15, 2011, the defendant was interviewed by federal agents in the presence of attorney Edwards (also referred to as the "first debriefing"). (See J.E. 120; DE 48 at 3; Tr. 97). At this first debriefing, petitioner stated that he had government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.   (J.E. 120).  Petitioner's reported responses to the investigating agents' questions regarding the nature of government

authorization, the purpose of shipping firearms to the United Kingdom, the disposition of the

firearms after they arrived in the United Kingdom, and the location of security contracts, were not

credible.  Because of petitioner's inability to provide logical, concrete, and credible, information in

response to investigator's questions in support of petitioner's account, petitioner's statements at the

first debriefing gave the impression that petitioner was not being truthful or forthcoming with

investigators.

> 94.  For example, the report of the debriefing states:

> GREENOE stated that Jolie Rouge had a contract to place security on the Al
> Mayassa'a commercial ship that was leaving from the UK in a few days [after
> February 17, 2010].  [Special Agent] Fanelly asked GREENOE where the contracts
> for that particular job were located.  <u>GREENOE stated that the paperwork for that
> contract was in Muscat, Oman. . . .</u> [Special Agent] Fanelly asked where in Muscan
> the documents would be located.  <u>GREENOE stated that due to the time that has
> gone by since his arrest that GREENOE has no idea where the documents would be
> located now</u>.  . . . [Special Agent] Fanelly asked GREENOE how after only three
> days that three of the guns purchased at Carolina Shooters Supplies were recovered
> in a crime in Liverpool.  <u>GREENOE stated that he had no idea.</u> [Special Agent]
> Fanelly asked GREENOE if COPPLESTONE's team actually did security for the Al
> Mayassa.  <u>GREENOE stated that the contract was cancelled at the last moment.</u> . .
> . [With respect to the next shipment of guns, Special Agent] Fanelly asked where the
> contract for this particular job could be found.  <u>GREENOE stated that this contract
> and documents for this job could be found on the "cloud" computing system that he
> (GREENOE) had set up for his company (Jolie Rouge)</u>.  [Special Agent] Fanelly
> asked how these documents could be recovered from the "cloud."  . . . .  <u>After a
> lengthy explanation of the numbering system with IP addresses GREENOE could not
> give [Special Agent] Fanelly any reasonable explanation as to how to recover
> documents from Jolie Rouge's "cloud."</u>

(J.E. 120) (emphasis added).  The emphasized responses reveal an intent to evade and a lack of

critical information, where such information was necessary to support petitioner's assertion that he

had government authorization to ship firearms for purposes of arming ships for security contracts.

Petitioner's responses at the first debriefing gave counsel Edwards further reason to believe that

petitioner was not telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

95.  On February 16, 2011, the government filed a sealed motion to order the defendant to serve notice of a public authority defense, as required under Federal Rule of Criminal Procedure 12.3(a)(1), specifically noting in support thereof the following:

> The United States received information that the defendant was not acting on behalf of a government agency when he committed the crimes charged in the Indictment and this information was shared with the defendant.  The defendant signed a plea agreement on February 8, 2011. On February 15, 2011, the defendant was interviewed by federal agents in the presence of his attorney. On this same date, the defendant indicated that he in fact committed the crimes charged on behalf of an agency of the United States.

(DE 48 at 2-3).

96.  On February 22, 2011, the court granted the government's motion and ordered the defendant to serve notice of a public authority defense.

97.  After the first debriefing, counsel Edwards explained to petitioner that he did not have a valid public authority defense, in light of overwhelming evidence that petitioner was engaged in selling guns and there was no evidence of a contract with a shipping line for security services.  (Tr. 99-100).

98.  After the first debriefing, investigating agents for the prosecution reiterated to counsel Edwards that they had found no evidence that petitioner was acting under authorization from a government agency.  (Tr. 299-300).

99.  After the first debriefing, counsel did not inform petitioner of the court's order to serve notice of a public authority defense. (Tr. 99-100).  Counsel Edwards reasonably believed that it was

not necessary to inform his client of the court order, in light of their discussion that the public authority defense would not be viable under the circumstances of the case. (Tr. 99-100).

100. On February 22, 2011, the Defense Intelligence Agency sent an interim response to counsel Edwards's Freedom of Information Act Request, stating that the request will be worked on in the order the request was received, due to unusual circumstances, including the need to search in different locations, the need consult with different agencies, and the potential volume of records. (J.E. 123). The interim response did not provide any basis for counsel Edwards to investigate further a public authority defense in advance of entry of guilty plea.

101. On February 23, 2011, counsel Edwards received a report of psychological testing from Jim Hilkey, Ph.D. ("Hilkey"), wherein Hilkey opines that petitioner showed, among other things, "a strongly guarded denial and conscious unwillingness to admit personal problems . . . . He tends to rationalize his actions and tolerates criticism poorly." (DE 124). The test report did not provide any basis for counsel Edwards to investigate further a public authority defense in advance of entry of guilt plea, and the report provided further basis, in light of all the circumstances to that date, to conclude that petitioner was not telling the truth about government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts. At the same time, the report did not give counsel Edwards any reason to doubt petitioner's competency to proceed with a guilty plea.

102. On February 25, 2011, the government filed petitioner's signed plea agreement, ex parte and under seal, in which petitioner agreed to plead guilty to engaging in international travel to deal in firearms without a license, under 18 U.S.C. § 924(n); and exporting firearms from the

United States without a license, under 22 U.S.C. §§ 2778(b)(2) and 2278(c), which offenses were charged as counts 11 and 28 of the second superseding indictment filed February 2, 2011. (DE 53).

103. In its motion to seal the plea agreement, the government noted good cause for sealing, where the agreement provides for cooperation by defendant into recovery of firearms exported in the United Kingdom and their use in committing drug dealings and shootings in the United Kingdom. (DE 54).

104. On March 2, 2011, defendant appeared for arraignment and pleaded guilty to count 11 and 28 of the second superseding indictment, whereupon sentencing was set for the June 14, 2011, term of court.

105. At arraignment, petitioner confirmed the following with the court regarding counsel Edwards:

> Q    Now, Mr. Greenoe, have you had time to and have you in fact discussed your case and pleas with your attorney, Mr. Edwards?
> A    Yes, sir.
> Q    Has Mr. Edwards answered all of your questions concerning your case and your pleas?
> A    Yes, sir.
> Q    Are you satisfied with Mr. Edwards's representation of you in the case?
> A    Yes.

(J.E. 127 at 13). The court advised petitioner of the maximum statutory punishments he might receive if he was to plead guilty or be found guilty of all the fifty charges pending in the second superseding indictment, including certain counts that carried a maximum penalty of up to 20 years imprisonment. (J.E. 127 at 17). The court confirmed that petitioner understood the meaning of everything in the plea agreement, and that no one promised petitioner anything to get him to plead guilty to counts 11 and 28. (J.E. 127 at 21).

106. At arraignment, the court also confirmed petitioner's understanding of sentencing, noting: "Do you understand that any sentencing recommendations in [the] Plea Agreement are just recommendations, and that Senior Judge Howard is free to establish whatever advisory sentencing guideline range he believes to be correct, and to impose whatever sentence he believes to be just and proper, irrespective of any agreement you have with the United States Attorney, or any recommendation contained in that Plea Agreement?" to which petitioner responded in the affirmative. (J.E. 127 at 23).

107. On March 2, 2011, counsel Edwards wrote to petitioner's ex-wife regarding sentencing: "Under the sentencing guidelines I estimate that Steve's sentence will start (and I stress start) in a range of 64 to 78 months and hopefully go down from there." (J.E. 126). Counsel Edwards also advised of a second debriefing scheduled for the following week, including with agents from the United Kingdom. (Id.). It is reasonable to infer that counsel Edwards provided similar information to petitioner, thus providing emphasis that the sentencing calculation at time of plea was only an estimate and that many factors could influence sentence, including communications still to take place with the government. At the time of plea, counsel thus reasonably advised his client of the potential sentencing range he faced as well as the potential for sentencing adjustment based upon communications with the government.

108. On March 9, 2011, pursuant to the plea agreement, petitioner attended with counsel Edwards a second debriefing with investigative agents. (See J.E. 128). Petitioner's reported responses to the investigating agents' questions regarding deposits received from Cardwell, financial troubles, military record, Cardwell's background with marijuana, and purchase of firearms, were not credible. Because of petitioner's inability to provide logical, concrete, credible, information in

response to investigator's questions in support of petitioner's account, petitioner's statements at the second debriefing gave the impression that petitioner was not being truthful or forthcoming with investigators. Furthermore, the reported information provided by petitioner about his contacts in Europe and the middle east in security work did not provide any basis in defense of the charged conduct or towards mitigation of potential sentence.

109. On April 6, 2011, counsel Edwards sent petitioner a letter outlining numerous points of concern he had with information that petitioner had been providing to the probation officer and investigators. (J.E. 130). Counsel Edwards provided a candid and reasonable assessment to petitioner of deficiencies in petitioner's account, and counsel Edwards provided reasonable advice to petitioner that continuing in this manner could lead to a much longer sentence than expected. In particular, counsel outlined several inconsistencies in information petitioner provided that "tend to show that you [petitioner] are not being truthful." (J.E. 130 at 2). Counsel Edwards reasonably stated to petitioner, in light of information and circumstances known to him at that time: "I have to call BS on your story. If you want to see your boys anytime soon you need to start telling the truth. We still may be able to salvage your sentencing if you do." (J.E. 130 at 2).

110. On April 12, 2011, counsel Edwards sent petitioner a letter in response to a letter sent by petitioner on April 10, 2011. From the content of counsel Edwards's April 12, 2011, letter, it is reasonable to infer that petitioner's April 10, 2011, letter contained statements by petitioner attempting to justify his account of events, including continued assertion that he had government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts. Counsel Edwards's April 12, 2011, letter reasonably expressed exasperation at petitioner's continued assertion of information that counsel Edwards did not find credible.

111. Counsel Edwards included in his April 12, 2011, letter the following statements:

> I have neither the time nor the inclination to address your latest letter line by line. Rest assured I have never 'been asleep' during any of your debriefings or the probation interview. Instead, I made it a point to stay alert because I was always interested to see what new version of events would come out that you never told me. And that happened quite often. For example, now the 'Blazer funds' are definitely in Dubia. That's not what you told me or you[r] mother for months. But we are the ones that are mistaken right? Yeah, right. . . . If you want new counsel by all means go hire someone else. You have never listened to a thing I said anyway. Perhaps you can withdraw your plea and have that show trial you so desire.

(J.E. 132). Although the tone of these statements was harsh, transmission of this letter to petitioner did not fall below an objective standard of reasonableness, in light of information and circumstances known to counsel Edwards at that time. In particular, counsel Edwards had reason to believe that, unless petitioner changed course, he would be facing a significantly higher sentence than counsel Edwards had originally predicted.

112. On April 18, 2011, the probation office issued a first draft of the presentence report ("PSR"), in which the calculations relating to the advisory guideline range were significantly higher than expected by petitioner. (DE 62 at 2).

113. On April 19, 2011, counsel Edwards emailed petitioner's mother regarding the draft PSR, stating: "The guideline range calculation is high with a total offense level of 33 (meaning a recommended sentence of 120 months). I think there are 20 points we can challenge." (DE 119-3).

114. On April 19, 2011, petitioner's ex-wife sent an email message to counsel Edwards and others pointing out multiple inconsistencies in petitioner's account of his military service, education, financial status, and security work. This message provided counsel Edwards further basis to believe that petitioner was not telling the truth generally in communications with counsel Edwards and

investigators, and particularly in asserting that he had government authorization to ship firearms to the United Kingdom for purposes of arming ships for security contracts.

115. On April 19, 2011, petitioner sent counsel Edwards a letter outlining parts of the draft PSR, which petitioner believed were inaccurate or unjustified. Petitioner requested of counsel Edwards: "Please help me get these guidelines adjusted back to the realm of normal and I will gladly stick to the plea and go quietly. I know you want me to cooperate more but I can't any more than I have." (J.E. 134).

116. On May 4, 2011, petitioner's family engaged counsel Zeszotarski to assist counsel Edwards with the sentencing phase of the case. (DE 62 at 2).

117. On May 5, 2011, counsel Zeszotarski entered an appearance for petitioner.

118. On May 5, 2011, counsel Edwards and counsel Zeszotarski, on behalf of petitioner, moved for an extension of time to submit objections to the presentence report to May 27, 2011 and moved to continue sentencing hearing to the court's July 2011 term, noting in support that "[t]he calculations relating to the advisory guideline range in the draft PSR are significantly higher than expected by the Defendant." (DE 62 at 2). The court allowed the motion for extension of time.

119. On May 27, 2011, counsel Edwards and Zeszotarski, on behalf of petitioner, moved to extend time for objections to the PSR to June 10, 2011, and the court granted the motion.

120. On June 22, 2011, counsel Edwards and Zeszotarski, on behalf of petitioner, moved to continue the sentencing hearing, and the court granted the motion continuing the hearing until the August 9, 2011, term.

121. On July 7, 2011, the probation office filed its PSR and sentencing recommendation, providing for total offense level 33 and a guideline range for imprisonment of 120 months on count

11 and 135 to 168 months on count 28. (DE 69). The probation office recommended a sentence of 120 months on count 11 and 168 months on count 28, running concurrently. (DE 69).

122. On July 27, 2011, the Government produced to the defense interview reports of two relevant witnesses from the UK authorities that total 465 pages. In addition, the Government obtained a hard drive from a computer of petitioner from the UK authorities and was in the process of copying that hard drive. It was anticipated by counsel Zeszotarski that there were voluminous materials on the hard drive that must be reviewed for relevant material prior to sentencing. (See DE 72 at 1-2).

123. On August 2, 2011, counsel Edwards and Zeszotarski, on behalf of petitioner, moved to continue the sentencing hearing, and the court granted the motion continuing the hearing until the September 13, 2011, term.

124. On August 31, 2011, the government filed a motion for upward departure, based upon the number of firearms trafficked by petitioner, and the government provided new discovery to the defense. (See DE 76 at 1).

125. On September 2, 2011, counsel Edwards and Zeszotarski, on behalf of petitioner, moved to continue the sentencing hearing, and the court granted the motion continuing the hearing until the November 8, 2011, term of court.

126. On October 3, 2011, the government moved to unseal the plea agreement, noting that there was no longer a concern that efforts to recover firearms in the United Kingdom will be jeopardized by making the plea agreement public, (DE 79), which motion the court granted.

127.  On October 19, 2011, the government moved to continue sentencing, in order to enable a British agent to testify at the sentencing hearing, and the court granted the motion to continue to the December 13, 2011, term of court.

128.  On October 20, 2011, the DIA responded to petitioner's request for records stating it requires further consideration before any records will be released.  (See DE 85 at 2).

129.  On November 11, 2011, counsel Edwards and Zeszotarski, on behalf of petitioner, filed an ex parte motion for order to produce documents, seeking to have  the DIA produce any records it possesses relating to petitioner.

130.  On November 30, 2011, counsel Edwards and Zeszotarski, on behalf of petitioner, moved to continue the sentencing hearing to allow for further gathering of documents, and the court granted the motion continuing the hearing until the January 10, 2011, term of court.

131.  On January 3, 2012, the government filed a sentencing memorandum.

132.  On January 3, 2012, counsel Edwards and Zeszotarski, on behalf of petitioner, filed a response in opposition to the government's motion for upward departure; and memorandum of law regarding objections to the PSR.

133.  On January 4, 2012, counsel Zeszotarski only, on behalf of petitioner, filed a sentencing memorandum and affidavit of petitioner.

134.  On January 4, 2012, the government filed a sentencing memorandum.

135.  On January 10, 2012, the court sentenced petitioner to a term of imprisonment of 120 months on each count to run concurrently for a total term of 120 months, denying the government's motion for upward departure and denying defendant's motion for variance.

*Ultimate Factual Findings on Issues Raised*

136. Counsel Edwards reasonably advised petitioner on the availability of a "public authority defense" and investigated properly the defense, in light of the information available to him and the circumstances of the case.

137. Counsel Edwards reasonably did not advise petitioner of the government's February 16, 2011, sealed motion to demand notice of a public authority defense, because at that point in time counsel reasonably had determined, as discussed with petitioner, that it was not in petitioner's best interest to further pursue a public authority defense.

138. Counsel Edwards did not advise petitioner of the court's February 22, 2011, sealed order to disclose public authority defense, because at that point in time counsel reasonably had determined, as discussed with petitioner, that it was not in petitioner's best interest to further pursue a public authority defense.

139. Counsel Edwards reasonably investigated petitioner's asserted public authority defense after having been informed of its substance, in light of the information communicated to counsel Edwards at the time of his representation and the evidence and information disclosed by the government.

140. Although counsel Edwards did not contact personally all individuals mentioned by petitioner as having knowledge of petitioner's asserted authority to ship firearms to the United Kingdom, counsel Edwards received sufficient information under the circumstances of the case to conclude reasonably that further interviews or investigation into the public authority defense would be fruitless. Such information included lack of critical leads from Stanford and Klein; lack of critical information concerning contracts with shipping agencies; and inconsistencies in petitioner's

40

account of his asserted defense, coupled with significant evidence produced by the government contradicting petitioner's claims of authorization to ship firearms for purposes of shipping contracts.

141.  Counsel Edwards reasonably communicated to petitioner what would be required to assert a public authority defense, and counsel reasonably explained that petitioner had not provided sufficient information to support a valid public authority defense.

142.  Counsel Edwards sufficiently understood the legal requirements of a valid public authority defense to the extent necessary to advise petitioner that a public authority defense was not a viable defense under the circumstances of this case.

143.  Counsel Edwards reasonably did not respond on behalf of petitioner to the court's February 22, 2011, order to disclose petitioner's asserted public authority defense, and reasonably did not raise it at any point during petitioner's March 2, 2011 plea hearing, because at that point in time counsel reasonably had determined, as communicated to petitioner, that it was not in petitioner's best interest to further pursue a public authority defense.

144.  Counsel Edwards suggested to petitioner after he had signed the plea agreement that government attorneys believed petitioner was continuing to assert, without credible basis, that he had shipped firearms with government authorization for purposes of providing security on ships.

145.  Counsel Edwards reasonably communicated to petitioner at that time that it was not in petitioner's best interest to continue to assert that petitioner had shipped firearms with government authorization for purposes of providing security on ships, and that continuing to do so undermined petitioner's credibility and chances for a mitigated sentence.

146.  Counsel Edwards reasonably considered sentencing enhancements in advance of plea and negotiated terms of a plea agreement that would be favorable to petitioner.

147.   In particular, counsel Edwards was aware, as communicated to petitioner, that petitioner's best chance for a favorable plea agreement and a low sentence with fewer enhancements was by being forthcoming and truthful in debriefings with the government.

148.   Counsel Edwards was aware, as communicated to petitioner, of the significant volume of evidence against petitioner, and reasonably predicted the risk that the government could draw upon such evidence in enhancing petitioner's sentence if petitioner was not forthcoming and truthful in debriefings with the government.

149.   In recommending that petitioner sign the plea agreement, counsel Edwards reasonably believed, as communicated to petitioner, that petitioner had a good chance of receiving a mitigated sentence if petitioner stopped asserting that he was acting in accordance with government authorization in shipping firearms to the United Kingdom for purposes of providing security for shipping contracts.

150.   In recommending that petitioner sign the plea agreement, counsel Edwards reasonably believed, as communicated to petitioner, that petitioner had a good chance of receiving a mitigated sentence if petitioner provided further information to investigating agents about his procurement of firearms and their disposition in the United Kingdom, including details about co-conspirators and financial arrangements made for the shipments.

151.   Based on the information provided by petitioner and the government at the time of the plea, counsel Edwards did not have a reasonable basis to negotiate a more favorable plea than the one signed by petitioner.  Nor did counsel Edwards have a reasonable basis to negotiate a factual stipulation for the plea, in light of the evidence against petitioner and the number of charges levied against petitioner.

152. Counsel Edwards reasonably advised petitioner of potential sentencing guidelines ranges in advance of the plea, providing appropriate level of qualifications expressing that the ultimate sentence could be significantly impacted by the level of cooperation petitioner offered to the government.

153. Given the government's interest in cooperation and full disclosure by petitioner, it was not unreasonable for counsel Edwards to predict provisionally and with qualification that petitioner could face a term of 46-57 months in October 2010, and 24-48 months in January 2011, where counsel emphasized the importance of cooperation and full disclosure for attaining these ranges.

154. Counsel Edwards's predictions of sentencing guideline ranges in advance of petitioner's guilty plea were not unreasonable in light of all the circumstances, including the uncertainty regarding the extent to which petitioner was going to be forthcoming and cooperative in debriefings with the government.

155. Counsel Edwards reasonably balanced duties of advocating for defendant's cause, consulting with defendant on important decisions, keeping defendant informed of important developments, and encouraging defendant to move forward with a plea strategy that would provide the best chance of a favorable term of sentence.

156. Counsel Edwards did not provide ineffective assistance of counsel when counsel Edwards sent petitioner a letter on April 12, 2011, expressing exasperation at petitioner's continued assertion of information that counsel Edwards did not find credible. In light of information and circumstances known to counsel Edwards at that time, the tone and content of the letter were within the wide range of objectively reasonable performance of counsel for purposes of providing advice in the best interests of his client.

157. Petitioner did not provide to the government the level of cooperation and full disclosure reasonably anticipated and encouraged by counsel Edwards.

**D.     Conclusions of Law**

1. Counsel Edwards's performance in representing petitioner in preparation for his guilty plea and sentencing was "reasonable considering all the circumstances." <u>Strickland</u>, 466 U.S. at 688.

2. Petitioner has not "overcome the presumption that, under the circumstances, the challenged action[s]" of counsel Edwards "might be considered sound trial strategy." <u>Id.</u> at 689 (quotations omitted).

3. In the course of representing petitioner, Counsel Edwards "made all significant decisions in the exercise of reasonable professional judgment." <u>Id.</u> at 690.

4. Counsel Edwards's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," under the circumstances of this case. <u>Id.</u> at 690-91.

5. Counsel Edwards made "a reasonable decision that [made] particular investigations unnecessary" further into whether petitioner was authorized by a government agency to ship firearms to the United Kingdom for purposes of providing security on commercial ships. <u>Id.</u> at 691.

6. Counsel Edwards's actions in this instance were "based, quite properly, on informed strategic choices made by [petitioner] and on information supplied by [petitioner]." <u>Id.</u>

7. Where multiple factors and circumstances gave counsel Edwards "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel [Edwards's] failure to pursue those investigations" cannot now successfully "be challenged as unreasonable." <u>Id.</u>

44

8. Counsel Edwards reasonably advised petitioner of the potential sentencing ranges and the qualifications thereof in light of the circumstances of the case, in conjunction with information on sentencing provided at arraignment, to enable petitioner to enter into a knowing and voluntary guilty plea.

9. Petitioner's claim that his attorney did not provide effective assistance of counsel in advising him to plead guilty is belied by petitioner's sworn affirmations at arraignment. See Lemaster, 403 F.3d at 221-22.

10. In the alternative, as to petitioner' claim that counsel Edwards was ineffective in incorrectly predicting the sentencing guidelines range, petitioner cannot demonstrate prejudice, where the court provided correct information as to maximum potential terms of imprisonment at arraignment. See United States v. Foster, 68 F.3d 86, 88 (4th Cir. 1995).

11. In sum, petitioner has failed to establish by a preponderance of the evidence that counsel Edwards provided ineffective assistance of counsel.

12. Therefore, petitioner's claim of ineffective assistance of counsel is without merit.

13. Where the court previously dismissed petitioner's claim of prosecutorial misconduct, and where the court presently denies petitioner's claim of ineffective assistance of counsel, petitioner's § 2255 petition is DENIED.

**E.      Certificate of Appealability**

A § 2255 petitioner "cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1). A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issues presented should have been decided differently or show the issues presented are "adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000). After reviewing the claims presented in the habeas petition in light of the applicable standard, the court concludes that reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and that none of the issues presented by petitioner are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

## CONCLUSION

Based on the foregoing, petitioner's § 2255 motion (DE 105) is DENIED. A certificate of appealability is DENIED.

SO ORDERED, this the 2nd day of December, 2015.

LOUISE W. FLANAGAN
United States District Judge